UNITED STATES v. NEBO OIL CO., Inc.
Civ. A. No. 2379.

United States District Court
W. D. Louisiana, Shreveport Division.
April 22, 1950.

Malcolm E. Lafargue, U. S. Atty., William J. Fleniken, Asst. U. S. Atty., both of Shreveport, La., and Sol. B. Press-

burg, Sp. Atty., of Alexandria, La., for plaintiff.

Monroe & Lemann, New Orleans, Louisiana; and James D. Heldt, Dallas, Tex., for defendant.

PORTERIE, District Judge.

This litigation arises out of a conveyance of all of the oil, gas and sulphur in, on and under the tracts in dispute from Bodcaw Lumber Company of Louisiana, Inc., to Good Pine Oil Company, Inc. (the defendant's predecessor in title), under a deed dated November 12, 1932.

The instrument granting the mineral rights contained the following provision: "* * * it being expressly stipulated that none of said rights in any of said lands shall be prescribed unless there shall elapse a Full Period of Ten (10) Years in which there shall be no exercise of any of the foregoing rights or user of any of the lands aforesaid under and by virtue hereof."

The history of that conveyance is of some importance. In 1932 five lumber companies owning lands in north central Louisiana decided to pool the mineral rights which they owned in order to secure the exploration and development of their lands. To that end, they conveyed all of the oil, gas and sulphur in, on and under the lands which they owned to Good Pine Oil Company, Inc., a corporation organized for that purpose, receiving stock in direct proportion to the minerals which they contributed. Included in these conveyances was a deed dated November 12, 1932, conveying the minerals under 37,352 acres of land in Natchitoches Parish (including the tracts involved in this suit) from Bodcaw Lumber Company of Louisiana, Inc., to Good Pine Oil Company, Inc. That deed contained the following paragraph: "It is intended hereby to confer upon Vendee absolutely and without limit for time of their enjoyment any and every right, title and interest which this Vendor has to the oil, gas and sulphur within said lands, including the exclusive right to extract and produce same. And the rights herein conferred may be assigned, transferred or leased, in whole or in part, by Vendee or under its authority and shall inure to the benefit of Vendee, its successors and assigns, and lessees hereunder, it being expressly stipulated that none of said rights in any of said lands shall be prescribed unless there shall elapse a full period of ten (10) years in which there shall be no exercise of any of the foregoing rights or user of any of the lands aforesaid under and by virtue hereof."

Within ten years after this conveyance from Bodcaw to Good Pine Oil Company was executed and within ten years of the date on which this suit was instituted, five wells, all dry holes, were drilled on the lands described in that conveyance. None of those wells, however, were drilled on the tracts involved in this suit or on tracts which were contiguous thereto.

In 1940, however, production was developed on other tracts conveyed to Good Pine Oil Company under the 1932 pooling agreement and many of the wells developed at that time are still producing. Most of the production which has been developed on the pooled acreage has been on acreage contributed by Good Pine Lumber Company of Louisiana, Inc., Trout Creek Lumber Company of Louisiana, Inc., and Tall Timber Lumber Company of Louisiana, Inc., although a small amount of production has been developed on acreage contributed by Bodcaw; no production has ever been developed on the acreage contributed to the pool by Grant Timber & Manufacturing Company of Louisiana, Inc., the fifth member of the pooling agreement. The income arising from such production has been distributed periodically to the participants in the pool in the form of dividends on the Good Pine stock, which in turn was owned in direct proportion to the acreage which each lumber company contributed to the pool.

Beginning in 1934, Bodcaw Lumber Company of Louisiana, Inc., and Grant Timber & Manufacturing Company of Louisiana, Inc., sold approximately 184,000 acres of land to the United States for inclusion in the Kisatchie National Forest. The mineral rights under approximately 180,000 acres of that land had previously

been conveyed to Good Pine Oil Company under the pooling agreement. In each case where the mineral rights had previously been sold to Good Pine Oil Company, the deed to the United States specifically stated that the sale to the United States was made subject to the prior sale to Good Pine Oil Company. The deed from Bodcaw Lumber Company to the United States covering the lands here involved was dated February 11, 1936, and specifically provided:

"This sale and transfer is made subject to the sale of all the oil, gas and sulphur, in, on, and under all of the lands conveyed herein as shown by act of sale dated November 12, 1932 * * * wherein Bodcaw Lumber Company of Louisiana, Incorporated, was the vendor, and Good Pine Oil Company, Incorporated, was the vendee. The mention of these mineral sales and of the rights granted therein is made solely for the purpose of limiting vendor's warranty to the United States of America in the present sale, and the recital of the said mineral sales shall in no wise extend or enlarge the same in point of time, or limit, control, or otherwise restrict the manner of exercising its rights by the Good Pine Oil Company, Incorporated, its successors and assigns."

"There are also specially reserved by and unto the Bodcaw Lumber Company of Louisiana, Incorporated, the vendor herein, all the oil, gas and other minerals in, on and under all of the lands conveyed herein and which is subject to the two sales to the Good Pine Oil Company, Incorporated, mentioned above, for a period of ten years after the expiration of the rights of the said Good Pine Oil Company, Incorporated, under the laws of the State of Louisiana.

"At the termination of the ten (10) year period, if not extended, or at the termination of any extended period * * * the right to drill for and remove oil and gas and to mine and remove minerals shall terminate, and a complete fee in the land became vested in the United States."

Prior to the time that Bodcaw sold the lands here in question to the United States, the Louisiana courts had held that a mineral conveyance created only an incorporeal interest in the nature of a servitude and had held that such mineral rights were subject to prescription by ten years nonuser. These decisions had seriously hampered the attempts of the United States to acquire lands in Louisiana for national forest purposes, and in 1935 the Solicitor of the Department of Agriculture rendered two opinions specifically considering the problem thus presented. After examining the applicable state and federal statutes he ruled that the prescriptive provisions of the Louisiana Civil Code were not applicable to lands acquired by the United States for national forest purposes. At the time Bodcaw sold its lands to the United States, it was advised by representatives of the United States that the mineral rights owned by Good Pine Oil Company would not be subject to prescription under the Louisiana Civil Code and a copy of the opinion of the Solicitor of the Department of Agriculture was delivered to Bodcaw's officers. The value fixed for the lands sold to the United States did not include the minerals, which the officers of Bodcaw considered to be very valuable, and the sale to the United States probably would not have been made had the officers of Bodcaw been of the opinion that Good Pine's mineral rights under the lands sold to the United States would prescribe or had the representatives of the United States taken the position that they were subject to the Louisiana laws of prescription. Both Bodcaw and Grant were very interested in the preservation of Good Pine's mineral rights since they owned 64.9% of Good Pine's stock.

In 1940, less than ten years after the mineral rights under tracts in question were conveyed to Good Pine Oil Company and within ten years of the date on which the lands in question were sold to the United States, the Louisiana legislature enacted a statute, La.Act No. 315 of 1940, declaring that when the United States acquired land subject to the prior sale of the oil, gas or other mineral rights, the mineral rights so previously sold were imprescriptible.

The defendant in this case, Nebo Oil Company, Inc., has acquired, by mesne conveyances, the oil, gas and sulphur conveyed by Bodcaw to Good Pine Oil Company, Inc., on November 12, 1932, and the basic question presented in this case is whether those mineral rights have prescribed.

This present action was instituted by the United States to obtain a declaratory judgment as to the ownership of the mineral rights involved.

This case is practically the exact duplicate of the case of Whitney National Bank of New Orleans v. Little Creek Oil Company, Inc., 212 La. 949, 33 So.2d 693, except that now, in the instant case, the United States is a party and the constitutionality vel non of La. Act No. 315 of 1940 may legally be put at issue.

We have to announce that most of this opinion is quoted verbatim from the brief of defendant. After a full consideration of the case, after a full reading of the briefs and the cases cited by both sides, we find the defendant to be correct. It would be a tremendous work to restate in our language the same conclusions that are so well stated already.

On the facts, we have checked the references to the record each time to our satisfaction.

*Act No. 315 of the Louisiana Legislature of 1940 Applies to the Facts of This Case.*

■ The rights acquired by a vendee under a mineral deed in Louisiana are in the nature of a personal servitude and, under normal circumstances, are subject to prescription by ten years nonuser under Articles 789 and 3546 of the Louisiana Civil Code.

■■ In Gayoso Co., Inc. v. Arkansas Natural Gas Corp., 176 La. 333, 145 So. 677, 678–679, the Court said: "The effect of the reservation of mineral rights in the conveyance of land is to create a servitude in the nature of a limited usufruct on the land in favor of the person. Frost-Johnson Lumber Co. v. Nabors Oil & Gas Company, 149 La. 100, 88 So. 723; Frost-Johnson Lumber Company v. Salling's Heirs, 150 La. 756, 855, 91 So. 207, 242;

Palmer Corporation v. Moore, 171 La. 774, 132 So. 229. The extinguishment of a servitude by nonuse for a given period is a prescription and not a peremption. Sample v. Whitaker, 172 La. 722, 135 So. 38."

This Sample v. Whitaker case is the leading case—with full and detailed reasoning.

The distinction between prescriptive and peremptive provisions was expressed as follows in Brister v. Wray Dickinson Co., Inc., 183 La. 562, 164 So. 415, 416: "When a statute creates a right of action, and stipulates the delay within which that right is to be executed, the delay thus fixed is not, properly speaking, one of *prescription*, but it is one of *peremption*. Statutes of prescription simply bar the remedy. Statutes of peremption destroy the cause of action itself. That is to say, after the limit of time expires the cause of action no longer exists; it is lost." (Italics in text.)

See, also, Guillory et al. v. Avoyelles Ry. Co. et al., 104 La. 11, 28 So. 899.

Within ten years after Bodcaw Lumber Company sold the mineral rights under the tracts involved in this case to Good Pine Oil Company, Inc., the Louisiana Legislature adopted Act No. 315 of 1940. The relevant provisions of that Act provide: "Section 1. Be it enacted by the Legislature of Louisiana, That *when land is acquired by conventional deed or contract*, condemnation or expropriation proceedings *by the United States of America,* or any of its subdivisions or agencies, *from any person, firm or corporation, and* by the act of acquisition, verdict or judgment, oil, gas, and/or other minerals or royalties are reserved, or *the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas, and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible."* (Emphasis supplied.)

The land involved in the litigation was acquired by the United States from Bodcaw Lumber Company by a conventional deed dated February 11, 1936; the land so acquired was, by the act of acquisition, conveyed subject to a prior sale of all the

oil, gas and sulphur to Good Pine Oil Company, Inc., under a deed dated November 12, 1932; and the conveyance of the oil, gas and sulphur to Good Pine Oil Company, Inc., had been made within ten years of the date on which Act No. 315 became effective.

The question is whether Act No. 315 is applicable to sales made to the United States prior to, but within ten years of, the effective date of the Act. The plaintiff contends that it is not; the defendant contends that it is.

As aforestated, in the case of Whitney National Bank of New Orleans v. Little Creek Oil Company, Inc., 212 La. 949, 33 So.2d 693, 696, the same deeds and the same statute involved in the present case were before the Supreme Court of Louisiana and the Court specifically held that Act No. 315 of 1940 was applicable to the conveyance from Bodcaw Lumber Company to the United States:

"It appears to us, as it did to the lower court, that Act No. 315 of 1940 is applicable to the sale by Bodcaw to the United States on February 11, 1936, which was made subject to the vendor's conveyance of the minerals to Good Pine on November 12, 1932,—not because there is anything in the terms of the statute to indicate that it was intended to have a retroactive application, but because of the general rule of law established by the jurisprudence of this court that laws of prescription and those limiting the time within which actions may be brought are retrospective in their operation. See De Armas v. De Armas et al., 3 La.Ann. 526; Shreveport Long Leaf Lumber Co., Inc. v. Wilson et al., 195 La. 814, 197 So. 566, and State v. Alden Mills, 202 La. 416, 12 So.2d 204.

"Articles 789 and 3546 of the Civil Code, which the act in question seeks to affect or change insofar as they apply to mineral servitudes on land acquired by the United States subject to mineral reservations, are articles establishing a period of prescription. See Sample et al. v. Whitaker et al., 172 La. 722, 135 So. 38. Since the act itself affects that prescriptive period, the general rule in the foregoing paragraph is applicable."

Having held that Act No. 315 of 1940 was applicable to the 1936 sale by Bodcaw to the United States, the Court then passed to the question of the constitutionality of the act and concluded that, since the United States was the only party which could be prejudiced by the application of Act No. 315 to sales made prior to its enactment, the United States was an indispensable party and dismissed the suit "for nonjoinder of necessary parties." It will be noted, however, that the case expressly holds that Act No. 315 is applicable to the deed from Bodcaw Lumber Company to the United States since, otherwise, the Court would have disposed of the case simply by holding that Act No. 315 was not applicable to sales made before its enactment and the constitutional questions would never have arisen.

The decisions of the Louisiana courts establish that Act No. 315 of 1940 is applicable to all sales which were made to the United States prior to its enactment provided that the prescriptive period had not expired before the Act became effective. Articles 789, 3529 and 3546 of the Louisiana Civil Code are prescriptive provisions. Sample et al. v. Whitaker, 172 La. 722, 135 So. 38; Cf. Gayoso Co., Inc. v. Arkansas Natural Gas Corp., 176 La. 333, 145 So. 677. Act No. 315 of 1940, by its terminology and by virtue of the fact that it affects or changes the effect of Articles 789, 3529 and 3546, falls in the same category.

The law is well settled in Louisiana that statute of prescription are remedial statutes. State v. Brossette, 163 La. 1035, 113 So. 366; Splane v. Tubre, La. App., 6 So.2d 361; Kearns v. City of New Orleans, La.App., 160 So. 470; Metropolitan Life Insurance Co. v. Haack, D.C., 50 F.Supp. 55. And the cases uniformly hold that statutes of prescription, being remedial statutes, are applicable to all actions instituted after they become effective even though the cause of action arose, or facts giving rise to the cause of action occurred, before the statute was enacted.

State v. Alden Mills, 202 La. 416, 12 So.2d 204; Shreveport Long Leaf Lumber Co., Inc. v. Wilson, 195 La. 814, 197 So. 566; Dowie v. Becker, 149 La. 160, 88 So. 777; Barrow v. Wilson, 39 La.Ann. 403, 2 So. 809; De Armas v. De Armas, 3 La.Ann. 526; Union Cotton Manufactory v. Lobdell, 7 Mart., N.S. 108; Board of Commissioners v. Sperling, La.App., 8 So.2d 380; Splane v. Tubre, La.App., 6 So.2d 361; Kearns v. City of New Orleans, La.App., 160 So. 470; Taglialavore v. Ellerbe, La. App., 149 So. 296. Many of the decisions take the position that the application of a statute revising a period of prescription to actions instituted after the statute is passed is a prospective application of the statute even though the cause of action arose, or the contract was made, before the statute was passed. State v. Alden Mills, 202 La. 416, 12 So.2d 204; Dowie v. Becker, 149 La. 160, 88 So. 777; Bostwick v. Thomson, 149 La. 152, 88 So. 775.

In many cases the Louisiana courts have simply stated that statutes of prescription are remedial statutes and that, in the absence of a clear expression of legislative intent to the contrary, remedial statutes are retrospective in their operation. Splane v. Tubre, La.App., 6 So.2d 361; Barrow v. Wilson, 39 La.Ann. 403, 2 So. 809; Kearns v. City of New Orleans, La.App., 160 So. 470; Shreveport Long Leaf Lumber Co. v. Wilson, 195 La. 814, 197 So. 566.

The plaintiff suggests that the application of Act No. 315 of 1940 to sales made to the United States prior to its effective date would violate Article 8 of the Louisiana Civil Code, which provides: "A law can prescribe only for the future; it can have no retrospective operation, nor can it impair the obligation of contracts."

The Louisiana courts have repeatedly held, however, that the application of prescriptive statutes, or other remedial statutes to causes of action which arose, or contracts which were made, before the effective date of the statute do not violate Article 8 of the Civil Code, usually on the ground that such application is prospective only. State v. Alden Mills, 202 La. 416, 12 So.2d 204; State v. Bermudez, 12 La.

352; City of New Orleans v. New Orleans and Carrollton Railroad Company, 35 La. Ann. 679.

The plaintiff also suggests that the use of the word "is" in the statute indicates that the legislature intended Act No. 315 to apply only to sales made after the effective date of the act. A similar argument, based on the use of the future tense in a prescriptive statute, was rejected in State v. Alden Mills, 202 La. 416, 12 So.2d 204, and an argument based on the use of the word "hereafter" was rejected in Shreveport Long Leaf Lumber Co. v. Wilson, 195 La. 814, 197 So. 566.

And similarly in the present case this Court should not discard the salutary rule that statutes of prescription and other remedial statutes have retrospective operation, particularly when the Supreme Court of Louisiana has held Act No. 315 of 1940 applicable to the facts of this case and when the note in the Tulane Law Review, upon which the plaintiff relies, concludes: "A recent ruling by the Department of Interior indicates that the federal government will contest the constitutionality of Act No. 315 of 1940 insofar as it retroactively applies to sales which were made to the federal Government prior to the effective date of the 1940 statute. The holding in Whitney National Bank v. Little Creek Oil Co. that Act No. 315 of 1940 is retroactive is supported by prior decisions interpreting prescriptive statutes, and in addition the holding is justified by equitable considerations. There is considerable evidence to the effect that agents of the federal government have made many land acquisitions upon representations that the Louisiana ten year rule of prescription has no application to mineral reservations in sales to the federal government." 22 T.L.R. 503.

The history of Act No. 315 also makes it clear that the Act has retrospective operation. The Louisiana Legislature of 1938 enacted two statutes rendering the reservation of mineral rights in deeds to the United States imprescriptible. The first, Act No. 68 of 1938, reads as follows: "Whenever land situated in any spillway or floodway is sold to or acquired by the

United States or the State of Louisiana, or any subdivisions or agencies thereof, for use in the construction, operation or maintenance of any spillway or floodway constructed, operated or maintained under authority of the Acts of Congress of May 15th, 1928, June 15th, 1936, or June 22, 1936 (Flood Control Act), as amended, or as hereafter amended, or under authority of any other Act or Acts of Congress, and the owner of said land reserves or retains the mineral rights or the rights in and to the minerals in said land, said rights shall be imprescriptible."

The second, Act No. 151 of 1938, reads as follows: "When real estate is acquired by the United States of America, the State of Louisiana, or any of its subdivisions, from any person, firm or corporation for use in any public work and/or improvement, and, by the act of acquisition, oil, gas and/or other minerals or royalties are reserved, prescription shall not run against such reservation of said oil, gas and/or other minerals or royalties."

Let us assume, for the sake of argument, that both of these statutes were repealed by Act No. 315 of 1940. It seems clear, however, that the Louisiana Legislature did not intend that sales made under the 1938 statutes would not be protected by the 1940 Act. Yet that would be the effect of a holding that the use of the term "is" indicated that the Louisiana Legislature did not intend the Act to apply to sales made prior to 1940. Under the circumstances it is clear that such an interpretation must be rejected.

The plaintiff also contends that Act No. 315 of 1940 is not merely a remedial or procedural statute, but affects substantive rights. This argument is clearly without merit. It was specifically rejected in Kearns v. City of New Orleans, La.App., 160 So. 470, 473, where the court said: "If it be contended that since the paving in question here was completed prior to the enactment of the Act of 1921, that act can have no bearing on the matter, the answer is that nevertheless that statute is applicable because it in no way affects the substantive rights of the property owner.

A change in a prescriptive period is not an interference with a substantive right. It merely affects the remedy."

And, as has been pointed out, the Supreme Court of Louisiana specifically held in Sample v. Whitaker, 172 La. 722, 135 So. 38, that Articles 789 and 3546 of the Civil Code were prescriptive, and not peremptive, provisions. Clearly, therefore, Act No. 315 of 1940 which amended the effect of those Articles was a remedial and procedural statute and did not affect substantive rights.

The argument was recently considered by the Supreme Court of the United States in Chase Securities Corp. v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628. There Mr. Justice Jackson, who wrote for the Court said: "This Court, in Campbell v. Holt [115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483], adopted as a working hypothesis, as a matter of constitutional law, the view that statutes of limitation go to matters of remedy, not to destruction of fundamental rights. The abstract logic of the distinction between substantive rights and remedial or procedural rights may not be clear-cut, but it has been found a workable concept to point up the real and valid difference between rules in which stability is of prime importance and those in which flexibility is a more important value."

The plaintiff also contends that Act No. 315 "in effect divests the United States of a right of property and attempts to make outstanding mineral rights valid forever." That is, in effect, an argument that the United States has a vested right in the statutes of prescription. Under the deed dated November 12, 1932, Bodcaw conveyed to Good Pine Oil Company, Inc., all of the oil, gas and sulphur in, on and under the tract in question in perpetuity. The United States purchased the lands involved in this suit subject to that prior sale. Consequently, the only hope that the United States could have had of acquiring the mineral rights was based on the possibility that the period of prescription would not be interrupted and that the prescriptive provisions of the Civil Code would not be

changed. At most its claim to the minerals was based on a mere expectation, which can hardly be considered a vested right.

The argument that a litigant has a vested right in a statute of limitations or a period of prescription which was in force when a contract was made, or a cause of action arose, has been repeatedly rejected by the courts of Louisiana and by the Federal courts. Terry v. Anderson, 95 U. S. 628, 24 L.Ed. 365; Davidson v. Commissioner of Internal Revenue, 5 Cir., 91 F.2d 516; Shreveport Long Leaf Lumber Co. v. Wilson, 195 La. 814, 197 So. 566; Splane v. Tubre, La.App., 6 So.2d 361; Bostwick v. Thomson, 149 La. 152, 88 So. 775; Kearns v. City of New Orleans, La. App., 160 So. 470; cf. Ex parte Collett, 337 U.S. 55, 69 S.Ct. 944, 959. In view of these decisions, it is submitted that the plaintiff's argument that it has a vested right in the precriptive provisions of the Louisiana Civil Code must be rejected.

 In addition to the cases above discussed, Act No. 315 of 1940 can be supported upon the doctrine of proportionate prescription. This is a refinement of the Roman law coming to us through the Louisiana civil law. Goddard's Heirs v. Urquhart, 6 La. 659; Xanpi v. Orso, 11 La. 57; Daniel Deal & Co. v. Patterson, 12 La.Ann. 728; Whitworth v. Ferguson, 18 La.Ann. 602; Fisk v. Bergerot, 21 La. Ann. 111; Dunlop & McCance v. Minor, 26 La.Ann. 117; McAdams v. Southern Express Co., 14 Orleans App. 276; Musick v. Central Carbon Co., 8 La.App. 136; Opinions of the Attorney General of Louisiana, 1932–34, pp. 821–823. That doctrine is stated as follows in Goddard's Heirs v. Urquhart: "When a new law alters the period of prescription, whether it makes it shorter or longer, the time which elapsed before the change is to be reckoned according to the former law and vice versa."

Under these cases, therefore, it is clear that the rights of Nebo Oil Company, Inc., in the oil, gas and sulphur under the tracts involved in this case will never prescribe.

Differently from the plaintiff, we consider that the cases of Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336; Coastal Club v. Shell Oil Co., D.C., 45 F.Supp. 859; and, Colgin v. Harris, D.C., 27 F.Supp. 798 (all three cited by plaintiff), hold in affirmance of our present conclusion.

 Therefore, Act No. 315 of 1940 is applicable to the sale from Bodcaw Lumber Company to the United States under the deed dated February 11, 1936, and to the sale of minerals by Bodcaw Lumber Company to Good Pine Oil Company, Inc., under the deed dated November 12, 1932, and renders the mineral rights now vested in the defendant imprescriptible.

 Now, the plaintiff has contended that the application of Act No. 315 of 1940 to this case "would constitute an interference with the use by the United States of its property and its right of disposal and regulation arising under Art. IV, Sec. 3, Cl. 2 of the U. S. Const." The cited Constitutional provision reads: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claim of the United States, or of any particular State."

By its own terms Article IV, Section 3, Clause 2, is plainly limited to property "belonging to the United States." If the federal government had actually owned the mineral rights here involved, the above quoted provision of Article IV would be applicable and any state legislation which was in conflict with the ownership of the minerals by the United States would be invalid. When Louisiana Act No. 315 was passed in 1940, however, the United States did not own these mineral rights and never had owned them. The federal government had no vested property right in such minerals, either present or future. It had nothing more than the vaguest expectancy of acquiring them at some future time, and that expectancy depended for its existence solely upon the uninterrupted running of a period of prescription established by state law,—a contingency which could readily be prevented by the discovery and continuous production of minerals, by periodic exploration, or by a change in the local law

by the Louisiana Legislature. Article IV, Section 3, Clause 2, by its own clear terms had no application to the Congressional regulation of such contingent rights.

The only case cited by plaintiff which requires consideration is Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 389, 61 L.Ed. 791. In that case the forest reservations in question were already owned entirely by the United States. No question of title of the property was involved. The Utah Light & Power Company had constructed dams, reservoirs, pipelines, power houses, transmission lines and miscellaneous structures on the property without requesting or seeking the permission of either the Secretary of the Interior or the Secretary of Agriculture. The Light & Power Company contended that their claims must be tested by the laws of the State in which the lands were located. The Court rejected the contention, saying: "Not only does the Constitution (Art. Four, § 3, cl. 2) commit to Congress the power 'to dispose of and make all needful rules and regulations respecting' the lands of the United States, but the settled course of legislation, congressional and state, and repeated decisions of this court, have gone upon the theory that the power of Congress is exclusive, and that only through its exercise in some form can rights in lands belonging to the United States be acquired."

This case holds only that a state legislature cannot give third parties an interest in, or the right to use, land owned by the United States.

Even if Article IV, Section 3, Clause 2, is regarded as having some application to a situation similar to that here presented, under the law as settled by the United States Supreme Court, Louisiana Act No. 315 of 1940 in no way conflicts with this constitutional provision.

It is clear, and the plaintiff concedes, that the United States has not acquired exclusive jurisdiction over the lands here involved. Wilson v. Cook, 327 U.S. 474, 66 S. Ct. 663, 90 L.Ed. 793, specifically held that the United States and the state had "concurrent jurisdiction" over lands acquired for national forest purposes under the Weeks Law, 16 U.S.C.A. §§ 480, 500, 513 et seq., 521, 552, 563, and under a state enabling act identical to the Louisiana statute.

■ Where the United States has not acquired exclusive jurisdiction, or, stated conversely, where the United States and a state have concurrent jurisdiction, the Supreme Court has repeatedly upheld state legislation which does not interfere with the purposes for which the land was acquired by the United States. Fort Leavenworth Railroad Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264; James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318; Atkinson v. State Tax Commission, 303 U.S. 20, 58 S. Ct. 419, 82 L.Ed. 621.

The only question raised by this case, therefore, is whether the application of Act No. 315 of 1940 would interfere with the purposes for which the United States purchased the land in question.

The land in question was purchased under the Weeks Law for inclusion in the Kisatchie National Forest. The terms of that Act expressly allowed mineral reservations, thus indicating unequivocally that outstanding mineral ownership would not interfere with the purpose for which the land was acquired. Section 9 of the original enactment provided: "Sec. 9. That such acquisition may in any case be conditioned upon the exception and reservation to the owner from whom title passes to the United States of the minerals and of the merchantable timber, or either or any part of them, within or upon such lands at the date of the conveyance * * *." 36 Stat. 962, c. 186, Sec. 9.

That section was amended in 1913 to read in part, as follows: "Such acquisition by the United States shall in no case be defeated because of located or defined rights of way, easements, and reservations, which, from their nature will, in the opinion of the National Forest Reservation Commission and the Secretary of Agriculture, in no manner interfere with the use of the lands so encumbered, for the purposes of [the Weeks Act] * * *." 16 U.S.C.A. § 518.

It thus appears that the acquisition of lands subject to outstanding mineral reservations, either in the vendor or third persons, was authorized by the Weeks Law, as amended, provided that the Commission and the Secretary of Agriculture found that such a reservation of minerals would not interfere with the use of the lands for national forest purposes. In the present case, therefore, since the lands were acquired subject to the prior sale of the oil, gas and sulphur to Good Pine Oil Company, the Commission and the Secretary of Agriculture must necessarily have found that the ownership of the minerals by Good Pine Oil Company would not interfere with the use of the land for the purposes for which it was acquired.

Moreover, the uncontradicted evidence shows that prior to the acquisition by the United States of the tracts involved in this suit, the National Forest Reservation Commission had adopted the policy of purchasing the lands subject to the reservation of mineral rights in perpetuity. And, the Commission had repeatedly stated that the acquisition of lands subject to outstanding mineral rights did not interfere with the use of the lands for national forest purposes. On the contrary, the view was expressed that the exercise of retained mineral rights were beneficial rather than detrimental to good forest management. The Commission had also taken the position that it had no authority to purchase mineral rights with funds which had been appropriated for the acquisition of lands for national forest purposes. These views were expressed as follows in the memorandum attached to the minutes of the meeting of the National Forest Reservation Commission held February 25, 1931, which were introduced as Nebo Exhibit No. 115:

"The Act of March 1, 1911, as amended, provides that lands may be purchased subject to the retention or reservation by the vendor or other parties in interest of the right to explore the lands and to develop and remove minerals therefrom. The present question, therefore, is one of policy, rather than of legal authority.

\* \* \* \* \* \*

"In the cases submitted to the Commission for consideration, the United States is buying and paying for land and timber only. It is not consciously buying deposits of valuable minerals. If minerals are known or believed to exist within any given tract of land, and if it is the intent and policy of the United States to also establish title to the minerals, it will be necessary to add to the land and timber value an additional value for the mineral deposits; to pay much higher prices per acre than would be necessary to acquire the lands subject to a reservation of the known or assumed mineral values. In many instances the value placed upon the minerals markedly would transcend the values at which the land and timber could be acquired.

"The first question which therefore arises is as to whether large investments in mineral values would be in accord with the purpose and intent of the Weeks Law [16 U.S.C.A. §§ 480, 500, 513 et seq., 521, 552, 563] and Clarke-McNary Law [16 U.S.C.A. §§ 471, 505, 515, 564 et seq.] which primarily were designed to promote the protection of navigable streams and the production of timber supplies. With practically limited appropriations available for purchase work and with the acquisition requirements largely in excess of the available appropriations, every dollar expended in payment for mineral values would be one dollar less available for the purchase of lands to carry out the primary purposes of the Acts and appropriations. One logically may inquire whether in the event Federal acquisition of mineral deposits is deemed desirable, the cost of their acquisition should not be borne by other appropriations.

\* \* \* \* \* \*

"So far as can be foreseen, the net effect accruing from the exercise of the retained mineral rights will generally be beneficial rather than detrimental to good forest management. Oil and gas development in the Allegheny Purchase Area seldom involves the withdrawal from timber production of more than one per cent of the surface, much of this is carefully cleared and patrolled pipe-line rights-of-way. The fire

preventive measures of the oil men contribute more to timber production than would the use of the small surface areas they occupy. In the Lake States, the shaft type of iron mining, the only practicable method within the Forests, involves the occupancy of only limited percentages of the surface, more than offset by cooperation in fire prevention and in the establishment of local markets for the less valuable forest products. In the Southern Appalachians, mineral occurs in small localized deposits, easily exhausted and of such character as to minimize interference with proper forest management.

"The extinguishment of outstanding mineral rights and the acquisition of all mineral rights in all lands hereafter acquired for forest purposes under the Weeks Law is not essential to the use of such lands for stream-flow protection or timber production, but would have to be justified on the basis of new public policies with reference to mineral resources and the social and economic necessity for their permanent control by public agencies. On such a basis their acquisition would be something separate and apart from the purchase of lands for National Forest purposes, and while the two objectives could be combined in a single purchase transaction they could not very well be both charged to forestry. On the contrary, the purchase of minerals, which would entail ultimate outlays probably surpassing those for forestry, should be recognized as a separate social and economic objective for which separate financial provision should be made."

The same view as to the authority of the Commission to acquire mineral rights with funds appropriated for the acquisition of lands for forest purposes was expressed at the meeting of the Commission held on March 3, 1938:

"Mr. Doxcy remarked that all of our purchases have been at a low price per acre and stated that he was of the opinion that we cannot expect the best of everything for the amount we are paying. Mr. Kneipp said that it is pretty hard to acquire land in oil counties where reservations are not made by owners, and that if we try to get land with minerals we will have to pay more. Mr. Kneipp added that former Secretary of War Hurley raised the question a number of years ago relative to the advisability of buying land subject to mineral rights, and the conclusion was reached that the expenditure of money for minerals from the appropriation authorized by the Weeks Law would not be in accordance with the Act. It is for this reason that we are acquiring lands without mineral rights he added."

Moreover, the minutes of the meetings of the National Forest Reservation introduced as Nebo Exhibits No. 115–124, inclusive, conclusively prove that the Commission has authorized the acquisition of millions of acres of land subject to the reservation of mineral rights in perpetuity, and has repeatedly authorized the acquisition of tracts where the mineral rights were outstanding in third persons on the ground that "such mineral rights will not interfere with the use of the land for national forest purposes or diminish the value of the land."

Finally, at the time the land involved in this litigation was purchased from Bodcaw, the United States was buying vast areas in Northern Louisiana subject to perpetual or other long term mineral reservations; and agents of the United States were advising prospective vendors that the Louisiana law of prescription did not apply to lands purchased by the United States and that mineral reservations in excess of ten years would be valid.

It seems apparent, therefore, that when the land involved in this suit was purchased from Bodcaw, the United States did not believe that the mineral rights outstanding in Good Pine Oil Company would interfere with the purposes for which the land was being acquired, and this view has recently been reaffirmed by the Department of Interior.

Another recent reaffirmance of the conclusion that mineral exploration will not interfere with the purposes for which the land was acquired may be found in the transfer of jurisdiction over government minerals to the Department of the Interior

in 1946 and the decision of that Department in July, 1947, to issue a mineral lease on lands, the status of which is identical to the lands here involved. Jurisdiction over the development of mineral resources on lands acquired under the Weeks Law was originally vested in the Department of Agriculture. This responsibility was transferred to the Secretary of the Interior by Section 402 of Reorganization Plan No. 3 of 1946, which reads: "Sec. 402. Functions relating to mineral deposits in certain lands.—The functions of the Secretary of Agriculture and the Department of Agriculture with respect to the uses of mineral deposits in certain lands pursuant to the provisions of the act of March 4, 1917 (39 Stat. 1134, 1150, section 520 of Title 16) * * * are hereby transferred to the Secretary of the Interior * * *: *Provided*, That mineral development on such lands shall be authorized by the Secretary of the Interior only when he is advised by the Secretary of Agriculture that such development will not interfere with the primary purposes for which the land was acquired and only in accordance with such conditions as may be specified by the Secretary of Agriculture in order to protect such purposes." 5 U.S.C.A. § 133y—16 note.

In a decision of January 20, 1947, the Department of Interior said: "The Secretary of Agriculture has advised that the execution of an oil and gas lease to the applicant will not interfere with the primary purpose for which the land to be leased was acquired, subject to the usual provisions and regulations for the protection of the surface and surface users."

Since the outstanding mineral ownership in a third person is not regarded by the United States as interfering with the primary purpose for which lands were acquired under the Weeks Law, it cannot successfully be argued that Louisiana Act No. 315 of 1940, which affects only the outstanding title to such minerals, is unconstitutional in violation of Article IV, Section 3, Clause 2, of the Federal Constitution.

The plaintiff suggests that "only those laws which were in effect when the United States acquired the property should be held to apply", and cites as authority for this proposition: Arlington Hotel Co. v. Fant, 278 U.S. 439, 49 S.Ct. 227, 73 L.Ed. 447; Williams v. Arlington Hotel Co., 8. Cir., 22 F.2d 669; Capetola v. Barclay White Co., 3 Cir., 139 F.2d 556, 153 A.L.R. 1046; and, James Stewart & Co. v. Sadrakula, 309 U.S. 94, 60 S.Ct. 431, 84 L.Ed. 596, 127 A.L.R. 821. Each of the cited cases, however, as well as United States v. Allegheny County, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209, from which the plaintiff quotes, relates to instances in which the United States had acquired *exclusive* jurisdiction over the property. The cases uniformly recognize that where the United States has acquired *exclusive* jurisdiction, the property is not subject to state statutes subsequently adopted. It is also held that state statutes in effect when the United States acquired exclusive jurisdiction remain in effect until they are abrogated by Congress unless they are inconsistent with the laws of the United States. James Stewart & Co. v. Sadrakula, 309 U.S. 94, 60 S.Ct. 431, 84 L.Ed. 596, 127 A.L.R. 821; Williams v. Arlington Hotel Co., 8 Cir., 22 F.2d 669.

 Where the jurisdiction of the United States is *concurrent* with the jurisdiction of the state, however, as is the case where lands have been acquired under the Weeks Law, it is uniformly held that state statutes enacted after the land is acquired are applicable unless they interfere with the purpose for which the land was acquired by the United States.

 Additionally, the plaintiff contends that, if Act No. 315 of 1940 is applied in the present case, it will impair the obligations of contracts and thereby violate Article I, Section 10 of the United States Constitution.

An examination of the appropriate instruments, however, establishes that, far from impairing the obligations of those contracts, Act No. 315 of 1940 actually enforces those obligations.

The rights of Nebo Oil Company are based upon the conveyance of minerals from Bodcaw Lumber Company of Louisiana, Inc., to Good Pine Oil Company, Inc.,

under the deed dated November 12, 1932. By the terms of that instrument, Bodcaw bargained and sold to Good Pine "all the oil, gas and sulphur in, on and under the following described lands", which lands included the tracts involved in this litigation. The instrument also contained the following provision: "It is intended hereby to confer upon Vendee absolutely and without limit for time of their enjoyment of any and every right, title and interest which this Vendor has to the oil, gas and sulphur within said lands, including the exclusive right to extract and produce same. And the rights herein conferred may be assigned, transferred or leased, in whole or in part, by Vendee or under its authority and shall inure to the benefit of Vendee, its successors and assigns, and lessees hereunder, it being expressly stipulated that none of said rights in any of said lands shall be prescribed unless there shall elapse a full period of ten (10) years in which there shall be no exercise of any of the foregoing rights or user of any of the lands aforesaid under and by virtue hereof."

■ It is clear that under the deed dated November 12, 1932, Bodcaw conveyed the mineral rights to Good Pine Oil Company in perpetuity. The last clause sets forth the minimum term of the grant and in no way seeks to restrict the terms of the conveyance. Moreover, five wells have been drilled upon the lands conveyed to Good Pine by Bodcaw under the deed dated November 12, 1932, and three of those wells were on tracts conveyed by the deed from Bodcaw to the United States dated February 11, 1936. And, consequently, even under the interpretation urged by the United States, the defendant's rights would not have expired under the terms of the conveyance dated November 12, 1932, since it specifically provided that none of the rights would prescribe unless there was "no exercise of any of the rights or user of any of the lands", and some of the rights were exercised.

The tracts involved in this suit were acquired by the United States from Bodcaw under a deed dated February 11, 1936. That instrument contained the following state-ment: "This sale and transfer is made subject to the sale of all the oil, gas and sulphur, in, on, and under all of the lands conveyed herein, as shown by act of sale dated November 12, 1932, and recorded in Conveyance Book 168, Page 419, of the Records of Natchitoches Parish, Louisiana, and also by an act of sale dated May 3, 1934, and recorded in Conveyance Book 171, Page 72, of the Records of Natchitoches Parish, Louisiana, wherein Bodcaw Lumber Company of Louisiana, Incorporated, was the vendor, and Good Pine Oil Company, Incorporated, was the vendee. The mention of these mineral sales and of the rights granted therein is made solely for the purpose of limiting vendor's warranty to the United States of America in the present sale, and the recital of the said mineral sales shall in no wise extend or enlarge the same in point of time, or limit, control, or otherwise restrict the manner of exercising its rights by the Good Pine Oil Company, Incorporated, its successors and assigns."

■ It thus appears that the United States acquired the tracts involved in this litigation subject to the prior sale of the oil, gas and sulphur as evidenced by the deed dated November 12, 1932. It would also seem to be clear that Bodcaw and the United States could not take any action which would in any way prejudice the rights of Good Pine Oil Company. Therefore, the defendant's rights depend entirely upon the covenants contained in the November, 1932, deed.

The undisputed evidence in this case also establishes that at the time the United States purchased the land involved in this litigation, they did not expect or intend to acquire the mineral rights under the tracts purchased. Witnesses for the plaintiff testified that at the time the sale was made Bodcaw's officers had been advised by representatives of the United States that the prescriptive provisions of the Louisiana Civil Code did not apply to lands sold to the Federal Government. This interpretation is supported by a memorandum dated May 29, 1935, issued by the Alexandria, Louisiana, office of the Forestry Service, which memorandum specifically declared

that Article 789 and 3546 of the Louisiana Civil Code did not apply to lands sold to the United States for national forest purposes. A copy of this memorandum was submitted to Bodcaw Lumber Company before the deed dated February 11, 1936, was executed. The officers of Bodcaw Lumber Company at that time were of the opinion that the mineral rights were extremely valuable and Mr. Boyce, who was associated with Bodcaw at that time, testified that he did not believe the sale would have been made had the officers of Bodcaw been of the opinion that the minerals would prescribe in ten years, or had the representatives of the Government taken the position that the Louisiana laws of prescription applied. The undisputed evidence also shows that the price paid by the United States for the lands involved in the deed dated February 11, 1936, covered only the value of the land and timber.

The minutes of the National Forest Reservation Commission, which were introduced as Nebo Exhibits 115–124, inclusive, establish that long before the sale involved in this litigation was made to the United States, the National Forest Reservation Commission had taken the position that the Louisiana laws of prescription did not apply to lands sold to the United States. It had also taken the position that, as a matter of policy, the National Forest Reservation Commission would not approve the purchase of mineral rights, and had declared that it had no authority to purchase minerals with funds which had been appropriated under the Weeks Law for the acquisition of lands for national forest purposes.

The general policy followed by the Commission was established at a meeting held on February 24, 1931. The pertinent portions of the minutes of that meeting read as follows:

"Secretary Wilbur stated that as he understood the general attitude taken by the Solicitor, and from the practicable standpoint, the acquisition of these outstanding mineral reservations is not a necessary feature of the acquisition of forest lands.

"Mr. Marshall said the Forest Service felt that the expense of setting up the machinery to condemn mineral rights would probably exceed any practicable benefits of that policy. He said that the Forest Service has had very little interference due to reservations.

"Secretary Wilbur asked if the Forest Service thought it would be impracticable to pursue such a policy.

"Mr. Kneipp stated that the original Weeks Law authorized and contemplated purchases subject to mineral reservations and the amendment of March 4, 1913, authorized purchases subject to mineral rights outstanding in third parties. The existing policy of purchasing lands subject to mineral reservations therefore is in full accord with legislative policy. Every effort is made to secure title free from reservations but that cannot always be done. Up to date the exercise of such rights has not unduly interfered with the use of the acquired lands for forest purposes and such interference as might occur is generally more than offset by cooperative benefits and savings in purchase price. Unless lands are acceptable subject to mineral rights it would be very difficult to consolidate the Government holdings.

"Senator Keyes asked what the question before the Commission was and Secretary Hurley said he raised the question as to the policy of acquiring forest lands without the complete title in fee and the solicitor has now made a report in which he shows that the policy of buying lands with mineral reservations outstanding, has the sanction of law and has been heretofore considered the best policy. The question is now whether we are going to adopt the suggestion of the solicitor.

"Senator Harris expressed the opinion that the Commission should have the power to act on individual cases. In nine-tenths of the cases the land could be acquired without the mineral rights reserved. Where the mineral rights amount to a great deal, he did not think it is intended by law that the Commission should put the Government into the timber or mineral business, which

would be using funds which should be put into the purchase of lands.

"A motion to continue the prevailing policy of buying lands subject to mineral reservations was moved by Secretary Wilbur, seconded by Senator Keyes and carried."

The question of acquiring lands subject to outstanding mineral reservations was again considered by the Commission at the meeting held on March 3, 1938, and the conclusions reached in 1931 were again restated.

At the meeting of the Commission held on May 20, 1947, Secretary Davidson referred to two tracts being acquired for inclusion in the Kisatchie National Forest with long term mineral reservations, "one until December 31, 1957, and another until December 31, 1997." The minutes of the meeting then read as follows:

"He added that there is a State law that mineral rights can only be held for ten years, but where they are for longer periods than ten years, the Department has administratively said it would respect commitments made by the Department of Agriculture. However, in view of the law, he wondered about the policy of this Department—whether it intended to continue to allow reservations of minerals for longer periods when acquiring lands.

"Mr. Hopkins inquired of Mr. Florance whether this had been given consideration in the past. Mr. Florance stated that the question came up about 1935 or perhaps a year or so earlier when national forest purchases first began in Louisiana. The Solicitor, at that time, he said, ruled that the State law (to the effect that if efforts to develop minerals are not made within a 10-year period the minerals accrue to the owner of the surface) would not apply where the Federal Government goes in and purchases lands by contract. That opinion has been reconsidered in the Solicitor's Office within the past four years and a recent ruling was made that minerals could be reserved beyond the 10-year period prescribed in the State law."

It was finally decided to pass the matter until the next meeting.

At the next meeting of the Commission, which was held on June 24, 1947, the matter was again passed. Attached to the minutes of that meeting is a memorandum dated June 23, 1947, from Howard Hopkins, Assistant Chief, Forest Service, addressed to the National Forest Rerservation Commission. That memorandum states:

"During the meeting of May 20, 1947, in relation to purchase proposals in Louisiana, Secretary Davidson raised the question as to the legality of reservations of mineral rights for terms longer than 10 years, in view of the Louisiana statutes which regard mineral reservations as servitudes and provide that they are extinguished by nonuse for 10 years.

"This question was considered by the Solicitor, Department of Agriculture, in 1935 and again in 1944. His conclusions, in general, are that under pertinent laws the decisions, including the Louisiana Act consenting to Weeks Law purchases, the validity of reservations in deeds from Private grantors to the United States is determined not by the laws of the State of Louisiana, but the laws of the United States. He further concludes that under Section 578 [518], Title 16 U.S.C.A., amendment to the Weeks Law, reservations are valid which 'in the opinion of the National Forest Reservation Commission and the Secretary of Agriculture do not in any manner interfere with the use of the land so encumbered'. Copies of opinion 13845 dated September 4, 1935 and opinion 4943 of March 25, 1944, Solicitor, Department of Agriculture, are attached.

"The Forest Service, in recommending purchases subject to reservations of minerals for longer than 10 years, has been guided by the foregoing legal opinions."

The memorandum of September 4, 1935, referred to in Mr. Hopkins' memorandum, is also attached to the minutes of the meeting of June 24, 1947. The September 4, 1935, memorandum was from C. W. Boyle, who was then Assistant Solicitor of the Department of Agriculture, to Mr. McConville. It specifically considered an opinion rendered by Mr. McGregor in which he concluded that the laws of Louisiana applied to

reservations granted by the United States in the purchase of lands in Louisiana "under the federal forest laws and the Act of Consent of Louisiana." Mr. Boyle rejected Mr. McGregor's opinion and concluded that the Louisiana laws of prescription were not applicable to lands purchased under the Weeks Law for national forest purposes.

"With some qualifications and limitations not now material, I think that the author has stated correctly the general principles of applicable law. Therefore, the opposite conclusions are based upon a variant conception and construction of the Act. I am fully persuaded that Section 578, [518], Title 16 U.S.C.A., if not expressly, by inescapable implication shows clearly that the United States, by sufficient legislative action with respect to the purchase of forest lands with reservations, has substituted its law for the laws of Louisiana; that Congress has positively exercised its power directly upon the subject matter involved and that such action entirely supersedes the Louisiana law."

The views expressed in this memorandum were also set forth in Mr. Hartman's memorandum, a copy of which was transmitted to Bodcaw before the sale to the United States was made, and they have recently been accepted as binding on the United States by the Department of the Interior.

It, therefore, conclusively appears that at the time the sale represented by the deed dated February 11, 1936, was made by Bodcaw to the United States, the parties to the transactions were of the opinion that the prescriptive provisions of the Louisiana Civil Code did not apply, and that the mineral rights owned by the Good Pine Oil Company were governed solely by the terms of the conveyance from Bodcaw to Good Pine under the deed dated November 12, 1932. Act. No. 315 of 1940 does no more than support the interpretations previously made by the United States, as is stated by the Solicitor of the Department of Agriculture in an opinion dated March 25, 1944: "This statute (Act No. 315 of 1940) is in harmony with the view of the law expressed in Acting Solicitor Boyle's opinion and is consistent with the Government's carrying out the contract which the vendor entered into relying upon the good faith of the United States. The 25-year reservation was a part of the consideration inducing him to convey the land. It is a property right and must be respected as such."

Under such circumstances, it is impossible to contend that Act No. 315 of 1940 impairs the obligations of contract. On the contrary, it enforces the contractual obligations of the parties as they understood them at the time the sales were made. See, City of New Orleans v. New Orleans and Carrollton Railroad Company, 35 La.Ann. 679.

Even in the absence of this history, however, it is clear that Act. No. 315 of 1940 does not violate Article I, Section 10 of the United States Constitution.

The plaintiff's argument that Act. No. 315 of 1940 impairs the obligations of its contract and, therefore, violates Article I, Section 10 of the United States Constitution is based on the contention that the prescriptive provisions of the Louisiana Civil Code "entered into and formed a part" of the deed from Bodcaw to Good Pine Oil Company, and the conveyance from Bodcaw to the United States "in the same manner as if they were expressly incorporated in their terms." Plaintiff cites as authority for this statement Von Hoffman v. City of Quincy, 4 Wall. 535, 71 U.S. 535, 18 L.Ed. 403. There the plaintiff brought an action of mandamus to compel the city to levy and collect the taxes necessary to pay the interest due on certain bonds issued by the city. At the time the bonds were issued, the city was authorized and required by statute to levy ad valorem taxes to meet the payments of interest as they fell due. Subsequently, the state legislature enacted legislation which, in effect, prohibited the collection of taxes for such purposes. The validity of the bonds were not denied and the defendant contended, therefore, that the obligations of its contract were not impaired. The Supreme Court rejected that argument, however, holding that the statute destroyed the value of the contract. In the Von Hoffman case the statute involved effectively, although indirectly, nullified the express obligations set forth in the con-

tracts; in the present case, however, Act No. 315 of 1940 enforces and supports those obligations.

■ Regardless of the view which may be held with respect to statutes of other kinds, the Supreme Court has specifically held that statutes of limitations do not enter into and become a part of any contract. In Campbell v. Holt, 115 U.S. 620, 6 S.Ct. 209, 213, 29 L.Ed. 483, the court specifically declared: "We certainly do not understand that a right to defeat a just debt by the statute of limitations is a vested right, so as to be beyond legislative power in a proper case. The statutes of limitation, as often asserted, and especially by this court, are founded in public needs and public policy,— are arbitrary enactments by the law-making power. Tioga R. R. Co. v. Blossburg & C. R. R. Co., 20 Wall [137], 150, [87 U.S. 137, 150, 22 L.Ed. 331, 337]. And other statutes, shortening the period or making it longer, which is necessary to its operation, have always been held to be within the legislative power until the bar is complete. The right does not enter into or become a part of the contract. * * * It violates no right of his, therefore, when the legislature says time shall be no bar, though such was the law when the contract was made. The authorities we have cited, especially in this court, show that no right is destroyed when the law restores a remedy which had been lost."

■■ And in the recent case of Chase Securities Corporation v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628, the Supreme Court declared that statutes of limitations did not create fundamental rights, saying:

"Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. Order of Railroad Telegraphers v. Railway Exp. Agency, 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788, (792). They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the avoidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

"This Court, in Campbell v. Holt, adopted as a working hypothesis, as a matter of constitutional law, the view that statutes of limitation go to matters of remedy, not to destruction of fundamental rights. The abstract logic of the distinction between substantive rights and remedial or procedural rights may not be clear-cut, but it has been found a workable concept to point up the real and valid difference between rules in which stability is of prime importance and those in which flexibility is a more important value."

And in Atchafalaya Land Company v. F. B. Williams Cypress Company, 258 U.S. 190, 42 S.Ct. 284, 286, 66 L.Ed. 559, which involved the validity of a prescriptive statute enacted by the Louisiana legislature, the Court said: "The act of prescription was a proper exercise of sovereignty. The state could recognize, as it did recognize, that there might be claims derived from it, asserted or to be asserted, rightfully or wrongfully, involving conflicts which should be decided and quieted in the public interest, and therefore, enacted the statute. And such is the rationale of statutes of limitations. They do not necessarily lessen rights of property or impair the obligation of contracts. Their requirement is that the rights and obligations be asserted within a prescribed time. If that be adequate, the requirement is legal, and its justice and wisdom have the testimony of the practices of the world."

Terry et al. v. Anderson, 95 U.S. 628, 24 L.Ed. 365, was a suit based on a bank charter which made all of the individual stockholders liable in the event a bank failed to redeem its bills. The Georgia legislature enacted a statute barring actions against stockholders if not started prior to January 1, 1870, which was nine months after the statute was enacted. The Court there stated:

"The argument is, that as the Statute of Limitations in force when the liability of the defendants was incurred did not bar an action until the expiration of twenty years from the time the action accrued, a statute passed subsequently, reducing the limitation, impaired the contract, and was, consequently, void.

"This court has often decided that statutes of limitation affecting existing rights are not unconstitutional, if a reasonable time is given for the commencement of an action before the bar takes effect. (Citations.) It is difficult to see why, if the Legislature may prescribe a limitation where none existed before, it may not change one which has already been established. The parties to a contract have no more vested interest in a particular limitation which has been fixed, than they have in an unrestricted right to sue." It thus appears that the Supreme Court has repeatedly held that a statute of limitations does not enter into and become a part of the contract, and that no one has a vested right in a statute of limitations. See, Shreveport Long Leaf Lumber Co. v. Wilson, 195 La. 814, 197 So. 566; Bostwick v. Thomson, 149 La. 152, 88 So. 775; Splane v. Tubre, La. App., 6 So.2d 361. This rule is particularly applicable in the present case where, as shown above, the parties intended that the statutes of prescription would not apply to their agreement.

[25] The Supreme Court has also held, as the cases above discussed show, that a state Legislature may extend or shorten a period of limitations without impairing the obligations of contract provided that, if the period is shortened, a person is given a reasonable time to enforce his rights before the period expires. Shreveport Long Leaf

Lumber Co. v. Wilson, 195 La. 814, 197 So. 566; Atchafalaya Land Co. v. F. B. Williams Cypress Co. et al., 146 La. 1047, 84 So. 351; Splane v. Tubre, La.App., 6 So.2d 361; Kearns v. City of New Orleans, La. App., 160 So. 470; City of New Orleans v. New Orleans and Carrollton Railroad Company, 35 La.Ann. 679; State ex rel. Richardson v. Recorder of Mortgages, 12 La.App. 62, 125 So. 473.

The validity of statutes enlarging a period of limitation was carefully considered in an annotation appearing in 46 A. L.R. 1101. The law is there summarized as follows:

"The several states have full power to alter or amend laws providing the mode and manner of dispensing justice in their respective judicial tribunals as they may consider best calculated to promote the ends of justice, provided that in so doing they do not impair the obligation of contracts; and ordinarily statutes of limitation do not have this effect, inasmuch as they act only on the remedy. Debtors and parties to contracts have no vested interests in particular limitation laws existing at any special time. It has appropriately been said that limitation statutes are not to be considered as elements entering into contracts, because the parties do not look forward to the breach of their bargains, but to the performance. 17 R.C.L. 680.

"As limitation laws prescribing the time within which particular rights may be enforced relate to remedies only, it is well settled by the authorities that the legislature has the power to increase the period of time necessary to constitute limitation, and to make it applicable to existing causes of action, provided such change is made before the cause of action is extinguished under the pre-existing statute of limitations."

The same view is expressed in 12 Am. Jur., Constitutional Law, Section 445, page 89: "An existing law of limitations is not considered as being a part of the contract. * * * The legislature by enactment may suspend the operation of a statute of limitations as to contracts in existence at the time of the passage of the act * * *."

Act No. 315 of 1940 does not violate Article I, Section 10 of the United States Constitution for two reasons: (1) an existing statute of prescription is not part of a contract and can be amended without impairing contractual obligations, and (2) Act No. 315 of 1940 merely supports the obligations of the contracts as the parties understood them when the contract was made.

■ It should also be noted that Act No. 315 of 1940 is valid as a reasonable exercise of the police power of the State of Louisiana. Home Building and Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481.

Counsel for plaintiff states at page 11 of its brief: "The grant of minerals to Good Pine Oil Company and the deed to the United States constitutes definite agreements under the law then existing that the mineral servitude should not extend for a period longer than ten years, if the rights to the minerals were not exercised during that period."

None of the cases cited by the plaintiff, however, supports this proposition. They merely hold that in Louisiana mineral rights will prescribe by ten years non-user even though the contracts creating the servitude specifically provide that the rights shall run for a longer period.

■ The plaintiff contends that Act No. 205 of the Louisiana Legislature of 1938 defines and classifies leases and contracts affecting such leases as real rights and incorporeal immovable property. The Supreme Court of Louisiana has repeatedly held that Act No. 205 of 1938 did not in any way change substantive rights but was purely a remedial statute. See, Allison v. Maroun, 193 La. 286, 190 So. 408; Tyson v. Surf Oil Company, 195 La. 248, 196 So. 336. Consequently, insofar as this case is concerned, Act. No. 205 of 1938 is immaterial, since the substantive rights of the parties were the same after it was enacted as they were before.

*Louisiana Act. No. 315 of 1940 does not violate Amendment 14, Section 1, of the United States Constitution.*

The plaintiff contends that La. Act No. 315 of 1940 violates the Fourteenth Amendment of the United States Constitution, which provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

■ This argument is clearly without merit. An examination of the terms of the Fourteenth Amendment establishes that it is not applicable, first, because the United States is not a "person" within the meaning of that term as used in that Amendment and, second, the United States is not "within the jurisdiction" of Louisiana as that phrase is used in the Fourteenth Amendment.

It has repeatedly been held that a sovereign is not a "person" within the meaning of the Fourteenth Amendment. Scott v. Frazier, D.C., 258 F. 669; Riley v. Stack, 128 Cal.App. 480, 18 P.2d 110; Los Angeles County v. Superior Court in and for Alameda County, 128 Cal.App. 522, 18 P.2d 112; People of New York v. Long Island R. Co., 60 How.Prac., N.Y., 395; Commissioners of State Ins. Fund v. Dinowitz, 179 Misc. 278, 39 N.Y.S.2d 34.

As the plaintiff points out, in some cases, a sovereign has been held to be a "person" within the meaning of that word as it is used in various statutes. The test to be applied, however, in each case is the intent of the legislature. In United States v. Cooper Corp., 312 U.S. 600, 61 S.Ct. 742, 743, 85 L.Ed. 1071, which held that the United States was not a "person" within the meaning of Section 7 of the Sherman Act, 15 U.S.C.A. § 15 note, Roberts, J., said:

"Since, in common usage, the term 'person' does not include the sovereign, statutes employing the phrase are ordinarily construed to exclude it. But there is no hard and fast rule of exclusion. The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate an intent, by the use of the term, to bring state or nation within the scope of the law.

"* * * Our function ends with the endeavor to ascertain from the words used,

construed in the light of the relevant material, what was in fact the intent of Congress."

Tested by this standard, the United States is clearly not a "person" within the meaning of the Fourteenth Amendment. That Amendment was adopted at the close of the Civil War for the specific purpose of guaranteeing Negroes their freedom. In re Slaughter-House cases, 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394; Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664; Holden v. Hardey, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441.

The term as used in other provisions of the Fourteenth Amendment clearly indicates that the United States is not a "person" as the word is used in that Amendment. For example, Section 1 of the Fourteenth Amendment provides that, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Section 2 provides that Representatives shall be apportioned according to population "counting the whole number of persons in each State, excluding Indians not taxed." Section 3 provides that "no person shall be a Senator or Representative in Congress * * *." It is equally obvious that the term "person" as used elsewhere in the Constitution does not include the United States. See, Article I, Section 2; Article I, Section 6; Article I, Section 7; Article I, Section 9; Article II, Section 1; Article III, Section 3; Article IV, Section 2 and Amendment IV. A comparison of the Fourteenth and Fifth Amendment, on which the due process clause of the Fourteeth Amendment was modeled, also clearly indicates that the United States is not a "person" within the meaning of the word as used in the Constitution.

It is inconceivable that Congress and the states would seek to regulate a relationship as delicate as that which exists between the state and Federal governments by muffled words and inept phrases. This would seem to be particularly true with respect to legislation adopted immediately after the close of the Civil War, which brought the relationship between the state and Federal governments into sharp relief. As Justice Holmes said in Pavis v. Pringle, 268 U.S. 315, 45 S.Ct. 549, 550, 69 L.Ed. 974, "The ordinary dignities of speech would have led to the mention of the United States * * *" if it had been intended that the United States was to be protected by the Amendment.

Finally, the United States is not "within the jurisdiction" of the state as that phrase is used in the equal protection clause of the Fourteenth Amendment.

No cases have been found which consider whether the United States or a state can be "within the jurisdiction" of another state. Such a holding, however, would seem to be entirely inconsistent with the theory that state and Federal governments are sovereign.

Most of the cases dealing with this phrase of the equal protection clause consider whether a foreign corporation is "within the jurisdiction" of a state, and, therefore, entitled to the protection of the Fourteenth Amendment. It has universally been held, since the decision of the Supreme Court in Blake v. McClung, 172 U.S. 239, 19 S. Ct. 165, 43 L.Ed. 432, that a corporation is not "within the jurisdiction" of a state unless it is subject to the service of process issuing from the courts of the state. Since the United States is not subject to the service of process issued by state courts, it would seem clear that the United States is not "within the jurisdiction" of any state as that phrase is used in the Fourteenth Amendment.

This interpretation is also supported by the cases which have arisen under Section 1 of the Fourteenth Amendment. That section provides: "All persons born or naturalized in the United States, and *subject to the jurisdiction thereof,* are citizens of the United States and of the State wherein they reside." (Emphasis ours.)

The phrase, "subject to the jurisdiction thereof", has been held to cover those persons, and only those persons, subject to the power of a state and under allegiance to it. United States v. Wong Kim Ark, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890; Elk

v. Wilkins, 112 U.S. 94, 5 S.Ct. 41, 28 L.Ed. 643. Since the United States is not subject to the power of any other sovereign nor under allegiance to any state, the cases decided under Section 1 of the Fourteenth Amendment would seem likewise to indicate that the United States is not "within the jurisdiction" of Louisiana as that phrase is used in the Fourteenth Amendment.

Very little attention need be devoted to the suggestion that the United States has been deprived of property without due process of law. As heretofore stated, no one has a vested interest in a statute of prescription. And the United States Supreme Court has specifically held that the repeal of a statute of limitations does not constitute a violation of the Fourteenth Amendment where the statute simply bars the remedy. Campbell v. Holt, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483; Chase Securities Corporation v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628.

Even if La.Act No. 315 of 1940 fell within the literal wording of the Fourteenth Amendment, however, it would nevertheless be valid on the ground that it is a reasonable classification. The United States Supreme Court has declared that the equal protection clause does not preclude the states from resorting to classification for the purposes of legislation provided there is a reasonable basis for the classification. "It only requires that the classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" Old Dearborn Distributing Co. v. Seagram-Distillers Corporation, 299 U.S. 183, 57 S.Ct. 139, 146, 81 L.Ed. 109, 106 A.L.R. 1476. See, Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070; Lindsley v. Natural Carbonic Gas Company, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912 C, 160 And the burden of showing that the classification is unreasonable is upon the party attacking the statute. The applicable rule was stated as follows in Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 55 S.Ct. 538, 540, 79 L.Ed. 1070: "It is a salutary principle of judicial decision, long emphasized and followed by this Court, that the burden of establishing this unconstitutionality of a statute rests on him who assails it, and that courts may not declare a legislative discrimination invalid unless, viewed in the light of facts made known or generally assumed, it is of such a character as to preclude the assumption that the classification rests upon some rational basis within the knowledge and experience of the legislators. A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it."

The United States introduced no evidence in this case to show that the classification was unreasonable and, under the rule stated above, the argument that La.Act No. 315 of 1940 violates the equal protection clause of the Fourteenth Amendment should be dismissed on the ground that the plaintiff has failed to sustain the burden placed upon it.

The record in the present case, and the history of Act No. 315 of 1940, however, clearly show that the classification of the statute is reasonable. The problem which it sought to solve was unique to the United States and the legislature was justified in limiting the application of the statute to it.

The acquisition of lands in Louisiana by the United States has been for specific purposes, which do not require the ownership of minerals or involve the production of oil and gas. Large tracts have been acquired under the Weeks Law for the creation of national forests. Additional tracts were purchased in connection with the construction of the Atchafalaya Spillway. Large areas were bought for Army camps. Substantial tracts were acquired for the creation of game refuges. It is a matter of common knowledge that the acquisition of tracts for these and other similar federal purposes were seriously hampered and impeded by the Louisiana laws of prescription. The difficulties encountered by the Department of Agriculture in the acquisition of lands for national forest pur-

poses because of the Louisiana laws of prescription are repeatedly stated in the records of the National Forest Reservation Commission and the Department of Agriculture. For example, the memorandum issued by the Forest Service of the Department of Agriculture on May 29, 1935, over the signature of A. W. Hartman, discussed this problem in detail:

"Owners of large tracts of land do not wish to sell their lands to the United States for National Forest purposes unless they can reserve to themselves the oil and gas rights for longer periods than ten years and want assurance that these rights will not be prescribed by nonuser of ten years. The question presented is whether the United States can purchase land for National Forest purposes in Louisiana wherein there is reserved to the vendor in the deed the oil and gas rights for longer period than ten years.

"The Louisiana statute consenting to the establishment of National Forests in a subsequent Act to Articles 789 and 3546 of the Civil Code. It was the intention of the State that the consent statute should give to the United States power to pass such laws as would be necessary to acquire the land and to administer it in accordance with the general laws, rules and regulations governing the National Forests. The provisions of the State law as to non-user of servitude appear to be an effective bar to the acquisition of lands in Louisiana for National Forest purposes if the State law applies to a deed conveying land to the United States."

Similar statements appear in the memorandum dated June 23, 1947, which was submitted to the National Forest Reservation Commission at a meeting held on June 24, 1947. There Mr. Hopkins, Assistant Chief, Forest Service, stated:

"It is obvious that restriction of mineral reservations to 10 years in the absence of affirmative use would seriously affect the possibilities of further consolidation of the Kisatchie National Forest. National forest purchases have been at relatively low prices. The half million acres acquired in Louisiana were bought at an average of

$2.80 per acre. In contrast, minerals, if and when discovered, can yield the land owner thousands of dollars per acre. It is apparent, therefore, that where minerals values are even remotely possible a prudent owner will dispose of the surface only if he can retain the mineral rights in such manner and for such period as will reasonably assure realization of any values which they may have.

"While the Forest Service has in the past bought some lands subject to 10-year reservations of mineral rights, with extensions so long as production persists, vendors are now insisting, in general, on longer periods. This is especially true where there is a possibility of oil, as in Louisiana. It appears, therefore, that continued purchase of lands at satisfactory prices for National Forests in Louisiana may depend in large part upon the acceptability of mineral reservations substantially in excess of 10 years."

At the meeting held on February 25, 1931, Mr. Kneipp, a representative of the Forest Service, advised the Commission: "Unless lands are acceptable subject to mineral rights it would be very difficult to consolidate the Government holdings." And at the meeting held on March 3, 1938, Mr. Kneipp again advised the Commission that it was "pretty hard to acquire land in oil counties where reservations are not made by owners."

It thus appears that, prior to the enactment of La.Act No. 315 of 1940, the Forest Service encountered serious difficulty in acquiring lands in Louisiana because of the prescriptive provisions of the Louisiana Civil Code and it is common knowledge that the statute was designed to relieve the problem encountered by the Department of Agriculture and other federal agencies engaged in the acquisition of land in Louisiana for federal purposes.

The prescriptive provisions of the Louisiana Civil Code also raised other serious problems. In states in which the Forest Service is free to acquire lands subject to perpetual mineral reservations, it can purchase tracts at the appraised value of the land and timber. Where they are forced

to purchase the mineral rights as well, however, they must add the value of the minerals to the land and timber values, and in many cases it far exceeds the value of the land and timber. In the past the National Forest Reservation Commission has taken the position that it is not authorized to purchase minerals with funds appropriated for the purchase of lands for forest purposes.

The Commission and the Department of Agriculture have repeatedly recognized that the ownership of the mineral rights by third persons will not interfere with the purposes for which the land was being acquired and have stated that the ownership of oil and gas rights by third persons are a positive benefit because they provide excellent fire control. Consequently, it cannot now be urged that La.Act No. 315 of 1940 is detrimental to the interests of the United States.

The history of La.Act No. 315 of 1940 also clearly establishes that it was enacted to relieve the problem faced by the various federal agencies arising out of the prescriptive provisions of the Louisiana Civil Code. In June, 1936, the United States enacted the Flood Control Act which was designed to improve the navigability of the Mississippi River and to protect the adjacent lands from being flooded. See, 33 U.S.C.A. § 701a. At the next session of the Louisiana legislature two acts were adopted which made mineral rights reserved in sales to the United States or the State of Louisiana imprescriptible. The first, La.Act No. 68 of 1938, reads as follows: " * * * That whenever land situated in any spillway or floodway is sold to or acquired by the United States or the State of Louisiana, or any subdivisions or agencies thereof, for use in the construction, operation or maintenance of any spillway or floodway constructed, operated or maintained under authority of the Acts of Congress of May 15th, 1928, June 15th, 1936, or June 22, 1936 (Flood Control Act), as amended, or as hereafter amended; or under authority of any other Act or Acts of Congress, and the owner of said land reserves or retains the mineral rights or the

rights in and to the minerals in said land, said rights shall be imprescriptible."

The second, La.Act No. 151 of 1938, reads as follows: " * * * That when real estate is acquired by the United States of America, the State of Louisiana, or any of its subdivisions, from any person, firm or corporation for use in any public work and/or improvement, and, by the act of acquisition, oil, gas and/or other minerals or royalties are reserved, prescription shall not run against such reservation of said oil, gas and/or other minerals or royalties."

In 1940 the Louisiana legislature combined both of these acts into one statute, La.Act No. 315 of 1940.

In view of the difficulties which various federal agencies had previously encountered in acquiring lands in Louisiana for federal purposes, in view of the fact that the United States wanted the land for highly specialized purposes and had no interest in, and did not want to buy, the mineral rights, and in view of the fact that the ownership of the mineral rights by third persons would not interfere with the purposes for which the land was being acquired, it seems obvious that the classification of La.Act No. 315 of 1940 rests upon a ground of difference having a fair and substantial relation to the object of the legislation. Certainly, it cannot be reasonably urged that the statute is unreasonable and arbitrary. There would seem to be an obvious difference between the sovereign and a private person or corporation. This difference was recognized in Wilson & Co. v. City of Jacksonville, 170 F.2d 876, 877, where the Court of Appeals for this Circuit upheld a statute fixing a shorter statute of limitations for actions against municipal corporations than was fixed for actions against private corporations solely on the ground that it was a reasonable classification even though the municipal corporation was engaged in many proprietary activities.

The statute was passed to facilitate the acquisition of lands in Louisiana by the United States Government for Federal purposes. In purchasing lands in other states for national forests, there is no limitation

upon the landowners in reserving their minerals in perpetuity, and, as the exhibits show, hundreds of thousands of acres were purchased in other states for national forest purposes, subject to the perpetual reservation of mineral rights. It was not unreasonable, therefore, for Louisiana to endeavor to place its citizens in the same position.

Moreover, the Federal Government is the largest landowner in Louisiana, and the dedication of large tracts for public purposes, such as forests and game preserves, withdraws these lands from commerce. It would appear entirely reasonable under these circumstances for the Louisiana Legislature to do all in its power to preserve the mineral rights in its citizens.

This is especially true when we realize that the Louisiana Civil Code Articles prescribing a servitude after ten years non-use are based upon a legal presumption of abandonment. De La Croix v. Nolan, 1 Rob., La., 321. This legal presumption had its foundation in the belief that it was not in the public interest to have titles to real estate clouded by outstanding servitudes unused for long periods of time. The Louisiana Legislature, in La.Act No. 315 of 1940, abolished this legal presumption, concluding that, when the surface had been withdrawn by the Federal government, the presumption was no longer justified nor in the public interest.

Therefore, the prayer of the plaintiff has to be refused: The United States is not the owner in complete fee of the land at issue; the defendant's mineral rights under these lands have not prescribed, because La.Act No. 315 of 1940 has rendered these mineral rights imprescriptible.

This decision by us may be reversed on appeal; therefore, for the purpose of dispatch, in order that the time it would take for its return will be saved, we shall consider the next defense that the prescriptive provisions of the Louisiana Civil Code are not applicable to lands purchased by the United States for National Forest purposes.

This contention is urged if La.Act No. 315 of 1940 is held inapplicable to the facts in the present case or is declared to be unconstitutional.

The "act of consent" enacted by the Louisiana Legislature authorizing the United States to acquire lands in Louisiana for national forest purposes provides: "Section 10. That the consent of the State of Louisiana be and is hereby given to the acquisition by the United States by purchase or gift of such land in Louisiana, as in the opinion of the Federal Government may be needed for the establishment of a National Forest or Forests in this region; provided that the State shall retain a concurrent jurisdiction with the United States in and over such lands so that civil process in all cases and such criminal process as may issue under the authority of the State against the person charged with a commission of any crime without or within the said jurisdiction may be executed thereon in like manner as before the passage of this Act. *Power is hereby conferred on Congress to pass such laws as it may deem necessary to the acquisition as herein provided for incorporation in said National Forests of such forests covered or cut-over lands lying in Louisiana as in the opinion of the Federal Government may be needed.* The power is hereby conferred upon Congress to pass such laws and to make or provide for the making of such rules and regulations of both civil and criminal nature and provide punishment for violation thereof, as in its judgment may be necessary for the management, control and protection of such lands as may from time to time be acquired by the United States under the provisions of this Section." (Emphasis ours.) La.Act No. 90 of 1922, as amended by La.Act No. 71 of 1924, § 1.

The first sentence of Section 9 of the Weeks Law, as amended in 1913[1], reads as

---

1. Prior to 1913, the sentence read: "Sec. 9. That such acquisition may in any case be conditioned upon the exception and reservation to the owner from whom title passes to the United States of the minerals and of the merchantable timber, or either or any part of them, within or upon such lands at the date of the conveyance * * *." 36 Stat. 962, c. 186, Sec. 9.

follows: "Such acquisition by the United States shall in no case be defeated because of located or defined rights of way, easements, and reservations, which, from their nature will, in the opinion of the National Forest Reservation Commission and the Secretary of Agriculture, in no manner interfere with the use of the lands so encumbered, for the purposes of [the Weeks Act] * * *." 16 U.S.C.A. § 518.

It is evident from the foregoing statutes that Louisiana authorized the United States to enact such legislation as was necessary to the acquisition of lands for national forest purposes and that Congress, recognizing that lands could not be acquired unless they were purchased subject to outstanding mineral rights, has exercised the power granted to it by Louisiana and has specifically declared that the acquisition of lands for national forest purposes shall not be defeated by mineral reservations which do not interfere with the use of the land for forest purposes. As Mr. Boyle points out in his opinions, however, the Louisiana laws of prescription were operating as an effective bar to the acquisition of lands in Louisiana for forest purposes. Landowners were unwilling to sell their lands because they ran a risk of losing their mineral rights in ten years, even though those rights had been reserved in perpetuity. This operation of the Louisiana laws of prescription, however, was directly contrary to the express provisions of Section 9 of the Weeks Law and completely nullified and frustrated the intent and purpose of that Section. Consequently, unless the Section is to be rendered meaningless, it must be held to have superseded the prescriptive provisions of the Louisiana Civil Code. The only question which remains, therefore, is whether Congress had authority to override the Louisiana laws of prescription, and such authority was clearly vested in it by the above-quoted provisions of the Louisiana act of consent. Congress was authorized to pass such laws as were necessary to the acquisition of lands for national forest purposes and the enactment of a statute abrogating the prescriptive provisions of the Louisiana Civil Code was necessary to the acquisition of lands for forest purposes. In short, Congress had the power to supersede the Louisiana laws of prescription insofar as national forest lands were concerned and it exercised that power.

■ Therefore, the prescriptive provisions of the Louisiana Civil Code do not apply to lands sold to the United States and the nature and extent of the mineral rights of the parties must be determined by the contract of the parties and not by the laws of Louisiana.

This interpretation of the applicable statutes was the official opinion of the Department of Agriculture prior to the enactment of Act No. 315 of 1940. In his opinion of March 4, 1935, Mr. Boyle, after pointing out that the Louisiana act of consent was enacted after Articles 789 and 3546 of the Louisiana Civil Code, stated:

"It was the intention of the State that the consent statute should give to the United States power to pass such laws as would be necessary to acquire the land and administer it. * * * The provisions of the State law as to non-user of servitude appear to be an effective bar to the acquisition of lands in Louisiana for National Forest purposes if the State law applies to a deed conveying land to the United States.

* * * * * *

"From the facts and law applicable thereto, I am of the opinion that the consent statute of Louisiana was intended to supersede any State law which may conflict with the acquisition by the United States of lands for National Forest purposes and to confer upon Congress power to pass such laws as are necessary to the acquisition; that Section 518, Title 16 U.S. C.A. makes reservations in deeds subject to rules and regulations of the Secretary

The 1913 revision was designed to eliminate the provision restricting mineral reservations to the owner from whom title passed and to permit the United States to acquire lands for forest purposes where mineral rights were outstanding in third persons.

of Agriculture; that the reservations and deeds in Louisiana would be subject to these rules and regulations; and that Articles 789 and 3546 of the Civil Code of Louisiana would not apply."

This opinion was reiterated by Mr. Boyle in his opinion of September 4, 1935. There, after mentioning the applicable state and federal statutes, he stated:

"It thus appears that, with the consent of the State of Louisiana, Congress has authorized the purchase of these lands with reservations which may or may not be greater than those permitted by the laws of Louisiana. When the State consents and no reservation appears in the Act of Consent to the contrary, eo instante, by operation of the United States Constitution, the State of Louisiana loses all of its political jurisdiction, and the United States becomes invested with exclusive authority over the lands.

"The validity of the inclusion of any reservations appearing in the deed from a private grantor to the United States necessarily must be determined, not by the laws of the State of Louisiana, but by the laws of the United States.

\* \* \* \* \* \*

"I am fully persuaded that Section 578, (518) Title 16 U.S.C.A. if not expressly, by inescapable implication shows clearly that the United States, by sufficient legislative action with respect to the purchase of forest lands with reservations, has substituted its law for the laws of Louisiana; that Congress has positively exercised its power directly upon the subject matter involved and that such action entirely supersedes the Louisiana law."

In 1944 Robert H. Shields, who was then Solicitor of the Department of Agriculture, reaffirmed the opinions of Mr. Boyle. He also declared (1) that the reservations of the minerals in the deeds to the United States was part of the consideration which induced the sale of the land to the United States, (2) that the reservation was a property right, and (3) that the destruction of that right would, under the circumstances, constitute a deprivation of property in violation of the Fifth Amendment of the United States Constitution.

So, again, the defendant prevails; and this conclusion is to be considered and found only in the case that we should be in error in our first conclusion.

*Evidence That 1932 Sale of Minerals by Bodcaw Lumber Company to Good Pine Oil Was Part of a Pooling Agreement Is Admissible and Does Not Violate the Parol Evidence Rule.*

Our conclusion in favor of the defendant, first-reached, is free of there being any pooling agreement.

At the trial the plaintiff objected to the introduction of evidence by the plaintiff establishing that the conveyance of minerals by Bodcaw Lumber Company to Good Pine Oil Company was part of a pooling agreement on the ground that such evidence violates the parol evidence rule. In support of this objection, plaintiff cites in its brief Article 2276 of the Revised Civil Code and numerous cases which hold that parol evidence cannot be admitted to alter, vary or contradict the terms of a written instrument.

The evidence to which the plaintiff objects does not in any way tend to alter, vary or contradict either the deed from Bodcaw to Good Pine Oil Company, dated November 12, 1932, or the deed from Bodcaw to the United States. On the contrary, the evidence was in support of those instruments and merely established that they meant what they said.

The instrument of November 12, 1932, conveyed the oil, gas and sulphur in, on and under the tracts involved in this litigation to Good Pine Oil Company "absolutely and without limit for time of their enjoyment." The deed of the lands here involved from Bodcaw to the United States was specifically made subject to the earlier sale of "all the oil, gas and sulphur in, on and under the lands conveyed herein" to Good Pine Oil Company. The evidence of pooling offered by the defendant has the effect of supporting and explaining the conveyance in perpetuity, not contradict, alter, or vary it.

■ The parol evidence rule was never intended to, and does, not prohibit the introduction of extrinsic evidence to prove a defense in the nature of interruption of prescription. Prescription arises by law and entirely apart from contract. Thus, interruption through drilling, production or minority is proved by the use of evidence dehors the contract. Standard Oil Co. of Louisiana v. Futral, 204 La. 215, 15 So.2d 65; Wier v. Texas Co., D.C., 79 F.Supp. 299; Wier v. Texas Company, 5 Cir., 180 F.2d 465. The same reasoning applies to proof of interruption of prescription through a pooling agreement to which plaintiff was not a party.

■ Finally, the "pooling" proof offered by defendant is admissible under the partial integration of exception to the parol evidence rule. The November, 1932, agreement between Bodcaw and Good Pine was only one of several similar and simultaneous agreements made between Good Pine and the individual mineral grantors. The parties did not see fit to express the separate subject of the overall pooling plan in the individual agreements. Such an expression is not necessary. The Civil Code of Louisiana merely requires that the transfer of title be in writing. La.R.C.C. Art. 2440. Where the writing does not represent a complete integration of all the agreements between the parties, as is the case with the November, 1932, conveyance from Bodcaw to Good Pine, the parol evidence rule does not forbid proof of those agreements not reduced to writing. Davies v. William W. Bierce, Ltd., 114 La. 663, 38 So. 488.

■ In any event, the evidence to which plaintiff has objected is admissible as evidence tending to show the true nature of the consideration expressed in November, 1932, deed. Smith v. Southern Kraft Corp., 202 La. 1019, 13 So.2d 335; Cleveland v. Westmoreland, 191 La. 863, 186 So. 593. The proffered evidence is also admissible for the purpose of interpreting the November, 1932, agreement according to the standard of the construction placed thereon by the parties in carrying out the agreement. La.R.C.C.Art. 1956.

*The Mineral Rights Owned by Defendant Have Not Prescribed Because They Have Been Pooled with Producing Mineral Acreage.*

■ In a series of recent decisions, the Supreme Court of Louisiana has established and reaffirmed the doctrine that, when two or more mineral tracts are pooled and production is obtained from part of the pooled acreage, prescription does not run against any of the pooled tracts as long as there is production from some part of the pooled acreage. Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583; Robinson v. Horton, 197 La. 919, 2 So.2d 647; Spears v. Nesbitt, 197 La. 931, 2 So. 2d 650; Dobbins v. Hodges, 208 La. 143, 23 So.2d 26; Farrell v. Simms, 209 La. 1072, 26 So.2d 143. The facts presented by this case clearly bring it within the operation of the rule of law established by these cases.

In 1932 five lumber companies—Bodcaw Lumber Company of Louisiana, Inc., Grant Timber & Manufacturing Company of Louisiana, Inc., Good Pine Lumber Company of Louisiana, Inc., Trout Creek Lumber Company of Louisiana, Inc., and, Tall Timber Lumber Company of Louisiana, Inc.,—agreed to convey all of the oil, gas and sulphur in, on and under approximately 400,000 acres of land which they owned in north central Louisiana to a new corporation to be formed for that purpose. The uncontradicted evidence establishes that the lumber companies agreed and intended to pool, and by their conveyances did in fact pool, all of the unleased mineral rights which they owned in Louisiana. The purpose of pooling their minerals was to secure the exploration of their lands for oil and gas and the development of any areas found to be productive. It was understood and agreed by the parties that each company would share in the production obtained from the pooled acreage in proportion to the acreage that it contributed to the pool, regardless of the original ownership of the tracts on which oil or gas were discovered and that the pool would be of perpetual duration.

In order to carry out this pooling agreement the lumber companies formed a new

corporation—Good Pine Oil Company, Inc. —and conveyed the unleased mineral rights which they owned to it in exchange for stock, each lumber company receiving the same percentage of the stock that the mineral acreage which it contributed bore to the total.[2] Good Pine Oil Company never acquired any mineral rights from any other source and never conducted any business other than that which arose out of the ownership of the minerals thus acquired.

By the terms of the deeds (all of which were identical except for the land descriptions) each lumber company conveyed to Good Pine Oil Company "all the oil, gas and sulphur in, on and under" the described premises.

Each of the deeds declared: "It is intended hereby to confer upon Vendee absolutely and without limit for time of their enjoyment any and every right, title and interest which this Vendor has to the oil, gas and sulphur within said lands, including the exclusive right to extract and produce same. And the rights herein conferred may be assigned, transferred or leased, in whole or in part, by Vendee or under its authority and shall inure to the benefit of Vendee, its successors and assigns, and lessees hereunder, it being expressly stipulated that none of said rights in any of said lands shall be prescribed unless there shall elapse a full period of ten (10) years in which there shall be no exercise of any of the foregoing rights or user of any of the lands aforesaid under and by virtue hereof."

Within ten years after the mineral rights were thus pooled, production was discovered on the pooled acreage. Two oil fields were developed in 1940 on lands contributed to the pool by Good Pine Lumber Company, Trout Creek Lumber Company and Tall Timber Lumber Company and the wells in those fields have produced

continuously since the date of discovery. Substantial additional production has been discovered on lands contributed to the pool by Good Pine Lumber Company, Tall Timber Lumber Company and Trout Creek Lumber Company and some minor production has been developed on lands contributed to the pool by Bodcaw Lumber Company, but no production has ever been developed on lands contributed by Grant Timber & Manufacturing Company. The income derived from such production has, from time to time, been distributed to the various participating lumber companies, or their successors, in the form of dividends.

Some years after the lumber companies pooled their mineral rights, and beginning in 1934, Bodcaw and Grant sold the United States more than 184,000 acres of their surface lands, including the acreage currently in question, for inclusion in the Kisatchie National Forest. The minerals under 180,161 of these acres, including those here involved, had previously been transferred to Good Pine Oil to form part of the pooled acreage. Good Pine Lumber Company, Trout Creek Lumber Company and Tall Timber Lumber Company have never sold any lands to the United States.

These sales to the United States were made expressly subject to the previous pooling conveyances. Each deed covering land under which the minerals had previously been conveyed to Good Pine Oil contained the following paragraph: "This sale and transfer is made subject to the sale of all the oil, gas and sulphur in, on and under all of the lands conveyed herein, all as shown by act of sale of November —, 1932, and recorded in Conveyance Book ——, Page ——, of the Records of —— Parish, Louisiana, wherein —— was the Vendor and Good Pine Oil Company, Incorporated, was the Vendee * * *."

2. The details of this arrangement were carefully worked out in 1920 when the first big oil boom hit northern Louisiana, and the reasons and purposes of pooling the minerals and the understanding that the parties to the pooling agreement reached at that time are clearly set forth in the records and minutes of the various lumber companies. The 1920 boom died, however, and the pool was broken up and the minerals were returned to the lumber companies that originally owned them. When interest in the area revived in 1932, the same plan was revived for the same purposes, however.

As has been mentioned, no production has ever been found on the lands which were originally owned by Grant and production in insignificant quantities only has been developed on the lands orginally owned by Bodcaw. The production from the lands contributed by Bodcaw and Grant has constituted only 1.97% of the income produced from the pooled minerals. The acreage originally contributed to Good Pine Oil by these two companies, however, constituted 64.90% of Good Pine Oil's total acreage; consequently, they received 64.90% of the stock of Good Pine Oil and they have received 64.90% of all dividends while producing less than 2% of the income. On the other hand, the acreage contributed to the pool by Good Pine Lumber, Tall Timber and Trout Creek have produced more than 98% of all of the income but they, and their successors have received only 35.10% of that income.

Thus, the pooling arrangement has enabled Bodcaw and Grant to enjoy thirty-three times more revenue than their minerals have produced—all at the expense of the other three lumber companies. And now it is urged that this situation should be magnified and made permanent by having a large part of the minerals contributed by Bodcaw and Grant withdrawn from the pool by prescription, thus rendering impossible any equitable adjustment by future production from the minerals they contributed.

Under far less aggravated circumstances the Louisiana Supreme Court has refused to countenance such an injustice. The doctrine established in the cases cited hereinabove is obviously designed to prevent just such an inequity.

Just one phase of one of these cases should be stressed. The Louisiana Supreme Court, in Dobbins v. Hodges, 208 La. 143, 23 So.2d 26, 29, said:

"The plaintiffs contend that since the West 140½ acres and the East 140 acres constitute two separate and distinct tracts of land, which are not contiguous, the exercise of the servitude on one of the tracts of land does not preserve the right of servitude over the other. They contend that the servitudes on the West 140½

acres have prescribed for the reason that such property was not developed within the ten-year prescriptive period.

"We find no fault with the propositions of law that: (1) drilling on a noncontiguous tract of land would not interrupt the running of prescription against rights on another tract of land; and (2) the reservation or grant of mineral rights on several non-contiguous tracts of land creates separate and distinct servitudes. *However, when parties agree to unitize and integrate an entire tract of land, composed of contiguous or non-contiguous tracts, and provide for the payment of royalties in proportions according to the acreage and interest owned, the contract of the parties must govern.*" (Emphasis ours.)

It should be noted that in Farrell v. Simms, 209 La. 1072, 26 So.2d 143, and in Dobbins v. Hodges, 208 La. 143, 23 So.2d 26, also, the mineral acreage involved were not contiguous to producing tracts.

The foregoing decisions clearly establish the rule of law that, regardless of contiguity, prescription does not run against mineral rights included in a pooling agreement while there is production from any of the acreage contributed to the pool.

A careful analysis of the decisions indicates that this rule applies when there has been (1) a pooling of minerals by several owners, (2) an arrangement whereby royalties were to be distributed to all participants regardless of the ownership of the specific minerals from which production was obtained, (3) subsequent production from a part of the pooled acreage, and, (4) acceptance of benefits by the members of the pool.

The case at bar fulfills all of these requirements.

(1) Bodcaw, Grant, Good Pine, Trout Creek, and Tall Timber all contributed their acreage to Good Pine Oil under a pooling arrangement designed to permit all companies to participate in minerals discoveries on the pooled lands in the proportion that the acreage contributed by each bore to the total. There is no question about the intention of all parties to pool their minerals. This purpose was spelled out in great detail in the 1920 negotiations.

And the 1932 transactions duplicated those of 1920.

(2) Stock in Good Pine Oil was distributed to each participating company so that royalties would be returned to the participants ratably.

(3) Production was subsequently obtained from a part of the pooled acreage, and is still being obtained.

(4) The stockholders of the contributing companies are still reaping benefits from production of the pooled acreage in proportion to the acreage originally contributed.

Failure to apply this rule in the present case would unjustly aggravate the inequity already existing. As has been pointed out, although Bodcaw and Grant have contributed only 1.97% of the production, they have received 64.90% of the income, whereas Good Pine, Trout Creek and Tall Timber, while contributing 98.03% of the production, have received only 35.10% of the income. Manifestly, the only manner in which this inequality can be rectified is by future mineral discoveries on the acreage contributed by Bodcaw and Grant. If this Court holds that the minerals not contiguous to the producing acreage have prescribed, not only will Good Pine Lumber, Tall Timber and Trout Creek be deprived of receiving any benefit from the minerals contributed by Bodcaw and Grant, but they must continue to pay to Bodcaw and Grant 64.90% of the proceeds from minerals produced on their land, since it is now impossible to restore the situation which prevailed prior to November, 1932. This is precisely the type of inequity which the Louisiana pooling doctrine is designed to prevent.

Nor can the United States, the present owner of the surface, contend that it is not bound by the pooling arrangement. The deeds to the United States specifically stated that the sale was "subject to the sale of all the oil, gas and sulphur" to Good Pine Oil in November, 1932.

The plaintiff does not deny that the various lumber companies intended and agreed to pool, and did in fact pool, their mineral rights in 1932 but bases its argument on the ground that there was "no statement, provision or indication in any of the instruments (i. e., the conveyances to Good Pine Oil) that a 'pooling agreement' was intended or contemplated." In other words, the plaintiff argues that the pooling agreement is not a defense because the United States had no notice of it. The answer to this contention is that Louisiana law requires no such notice. The only notice that the law requires is notice that there is an outstanding mineral interest, and such notice was given in this case by the recordation of the 1932 mineral deeds to Good Pine. Thereafter, the only requirement is that prescription be interrupted in some manner recognized by law. For example, the use of an ordinary right-of-way will interrupt prescription even though the owner of the dominant estate has no notice of such use. The Louisiana law has often recognized that running of prescription against a mineral right would be interrupted without requiring any recordation thereof. For example, use of the servitude, such as drilling a dry hole, interrupts prescription even though a careful examination of the land and of the record title would not reveal the operation. Lenard v. Shell Oil Co., 211 La. 265, 29 So.2d 844. A more striking example of the effective interruption of the running of prescription which would not be revealed in a title examination is illustrated by Sample v. Whitaker, 172 La. 722, 135 So. 38, and Ford v. Williams, 189 La. 229, 179 So. 298, which hold that prescription *liberandi causa* does not run against a mineral servitude so long as an interest therein is owned by a minor. In none of the foregoing cases is recordation necessary in order effectively to interrupt the running of prescription. In each the only notice required is notice that the land is subject to the servitude. If that requirement is satisfied, as it was in this case, the servitude persists even though the record title gives no indication that the prescription was interrupted and extensive investigation outside the record must be made in order to establish that the servitude is alive. The authorities cited have established that another method of interrupting prescription is by pooling minerals, production on some of the pooled acreage, and

receipt of benefits from such production. As the cases above indicate, there is no requirement that exercise of the servitude be made a matter of public record.

The plaintiff also contends that: "The evidence summarized above can in no way be said to be a pooling or unitizing arrangement since the activities of one landowner cannot constitute a pooling agreement nor can the activities of the holders or owners of minerals or mineral rights without the consent of the landowner constitute a pooling agreement."

We are unable to follow this argument. The pooling agreement involved in this case was made in 1932. There were five lumber companies, not one, who entered into the pooling agreement and at the time each lumber company owned the tracts involved in the pooling agreement in fee. Consequently, there is no basis in fact for the argument which plaintiff seeks to make.

And, so, if we should be found in error in our first, and again in our second, conclusion, then we find for the defendant on its third contention that as a result of the pooling arrangements entered into in 1932 and subsequent distribution of income arising out of production on part of the pooled acreage, minerals conveyed to Good Pine Oil and now owned by Nebo will not prescribe as long as there is production on any of the pooled lands.

Let judgment be prepared for our signature in keeping with the above opinion.